661 P.2d 1229

Robert E. RUSH, M.D., P.A., Profit Sharing Plan and Trust; Clark Real Estate Co., a corporation; and Robert Clark, Plaintiffs-Appellants,

v.

Peter Tash ANESTOS, Bankrupt, by and through Jay Burke, Trustee in Bankruptcy, and Peter T. Anestos and Ardath I. Anestos, individually, and Pocatello Greenhouse and Floral, Inc.; Anderson Lumber Co., a corporation; Joe Campbell dba Campbell Construction Co.; the State of Idaho, by and through the Idaho State Tax Commission; the United States of America Internal Revenue Service; Hamilton & Voeller Inc., a corporation; Financial Credit Corporation, Defendants,

and

Frank Delia and Jane Doe Delia, husband and wife, and Lockhart Co., Inc., Defendants-Respondents.

No. 13975.

Supreme Court of Idaho.

April 13, 1983.

Mark B. Clark and Randall C. Budge, Pocatello, for plaintiffs-appellants.

Roger B. Wright and John M. Sharp, Idaho Falls, for defendants-respondents.

BISTLINE, Justice.

Plaintiffs initiated this quiet-title action alleging that they had acquired the vendee's (Anestos') interest in a real property contract, wherein Trayis and wife were owners and vendors, the said vendee's interest being sold at a bankruptcy sale. Lockhart Co., successor to Financial Credit Corporation, was (along with other defendants) alleged to claim some interest in the real property involved because of an assignment of the vendee's interest executed in its favor to secure a loan to the vendees (Anestos); it was alleged that the interests created by the assignment were "either subsequent to and junior to the interests of the Plaintiffs herein, or have been fully foreclosed and terminated by the proceedings in bankruptcy, in bankruptcy proceedings in the United States District Court ...." Plaintiffs also alleged that subsequent to acquiring the vendee's interest in the Trayis-Anestos contract, they also acquired the Trayis title and vendor's interest in the contract.

Lockhart in answering admitted that it did so claim an interest, and in a counterclaim, thereafter amended, asserted that the assignment of the vendee's interest to it had been duly recorded, that the plaintiffs had been by it informed of the assignment, that there had not been any Notice of Default received by it, and alleged its willingness, and offer made therein, to tender an amount sufficient to bring the contract current at such time as the plaintiffs would advise it of the amount required to do so. Responding to the counterclaim, the plaintiffs alleged "that any interest the Lockhart Company may have in the subject premises is either extinguished by the bankruptcy proceedings ... or the Assignment under which Lockhart Company lays claim is invalid for other reasons ...."

Following trial, the district court concluded that the executed and acknowledged assignment [1] "is in the nature of an equitable mortgage and constitutes a lien on the real property which is the subject of the real estate contract," and that the bankruptcy proceeding did not vitiate it "since the deeds given by the Trustee in bankruptcy were subject to outstanding debts, encumbrances and the like." The district court first concluded that upon payment to Lockhart of the amount found due on its note, $12,125.62, title would be quieted in plaintiffs. Subsequently the court amended that final conclusion so as to give plaintiffs an election to pay off the Lockhart note either in full or in accordance with the payment schedule of the note, providing further that a failure by plaintiffs to notify Lockhart how it would pay the indebtedness would confer the right upon Lockhart to foreclose its equitable lien.

1. "This assignment is made and given to secure the payment of a promissory note of even date thereof, executed and delivered by Assignor to FINANCIAL CREDIT CORPORATION for the sum of Fifteen thousand dollars and no cents DOLLARS ($15,000.00), the payment of which will render this Assignment void, but otherwise to be in full force and effect.

"Assignors hereby covenant and agree that a default in the performance of the terms and conditions of the aforesaid real estate contract shall constitute a default in the terms and conditions of the promissory note of even date herewith from the Assignor to Financial Credit Corporation.

"Dated this 26th day of July, 1974.

/s/ Peter T. Anestos
(Assignor-Husband)
/s/ Ardath I. Anestos
(Assignor-Wife)"

The relief sought in this Court and a summary of the issues presented is by plaintiffs thusly stated:

"It is respectfully submitted that the decision of the trial court should be reversed to the extent that the trial court ruled that Lockhart has a mortgage lien upon the real estate. The only thing Lockhart established was that it had an assignment which might be classified as an equitable lien upon the purchaser's interest in the real estate contract of Anestos. That purchaser's interest is extinguished both by failure to make payments and by the bankruptcy proceeding and, therefore, the assignment no longer carries any rights with it."

The land here in question was part of a small acreage which was being purchased by Peter and Ardath Anestos (vendees) from Angelos Trayis (seller) on August 1, 1973, pursuant to an installment land sale contract. The contract provided that the vendees would receive title to four acres of land in return for a $5,000 down payment and would receive title to one additional acre upon each payment of $1,250 on the $50,000 principal. On July 26, 1974, the vendees borrowed $15,000 from Financial Credit Corporation (now Lockhart Corporation) giving as security (along with other assets) an assignment of their interest under the land sale contract. The security assignment encumbered the vendees' interest in the underlying land contract and specifically the property described in the contract. By March of 1976, the vendees were in arrears in payments to Financial Credit Corporation and to the seller, who did not at any time default the vendees for their delinquency. By April of 1978, Peter Anestos was in bankruptcy court and his contract equity, with other property, was a listed asset. Plaintiff Robert Rush Profit Sharing Plan and Trust (Rush) purchased the vendees' interest in a ten-acre section of the land in question for $700. Plaintiffs Clark Real Estate Company and Robert Clark (Clark) purchased the vendees' interest in a 9.3-acre section of the land for $500. The bankruptcy sale was made subject to "all existing debts, mortgages, liens, and encumbrances of each and every kind." On July 14, 1978, Rush and Clark thereafter jointly purchased the seller's title and contract vendor's interest for $46,628.05, which sum appears to have been the remaining balance due on the contract, and thereafter initiated this quiet title action. No issue is presented here other than the rights and priorities of Rush-Clark and Lockhart which go to the district court's decree holding that Lockhart's assignment is in the nature of an equitable mortgage against the involved real property.

## I.

It is in order to briefly review the nature of an installment land sale contract.

"An installment land sale contract is one of three security devices generally used in credit transactions in real estate and is, in essence, a hybrid composed of property law concepts on the one hand and contract law on the other. While the transaction involves the transfer of ownership of real property, it is governed by the terms of a contract in which vendor and purchaser join. The vendor generally, but not invariably, deposits a deed in escrow, but title does not pass to the purchaser until all installments are paid in accordance with the contract. The contract is frequently called a 'poor man's mortgage' because the vendor, as with a mortgage, finances the purchaser's acquisition of the property by accepting installment payments on the purchase price over a period of years ...." *Ellis v. Butterfield*, 98 Idaho 644, 646, 570 P.2d 1334, 1336 (1977).

An installment land sale contract works an equitable conversion of the land. The land sale contract is said to place equitable ownership in the vendee with the vendor merely holding legal title as security for payment of the debt. The status of the parties is somewhat analogous to that of a mortgagor and mortgagee. *See* Annot., 77 A.L.R. 270, 271 (1932). In *First Security Bank of Idaho v. Rogers*, 91 Idaho 654, 657, 429 P.2d 386, 389 (1967), the Court stated:

"The doctrine of equitable conversion is a fiction resting upon the fundamental rule of equity that equity regards that as done which ought to be done. Under the doctrine, an equitable conversion takes place when a contract for the sale of real property becomes binding on the parties. *The purchaser is then treated in equity as having an interest in realty* and the vendor an interest in personalty, that is, the right to receive the purchase money." (Emphasis added.)

As Justice Shepard more succinctly stated recently, "[a]n equitable conversion takes place when parties enter into a binding contract for the purchase and sale of realty. The purchaser is deemed the equitable owner thereof, and the seller is the owner of the purchase price." *George v. Tanner,* Idaho (1982) (Supreme Court No. 13434, opinion filed September 30, 1982) (Shepherd, J., dissenting). *See Walker v. Nunnenkamp,* 84 Idaho 485, 495, 373 P.2d 559, 565 (1962); *Ortiz v. Lane,* 92 N.M. 513, 590 P.2d 1168 (N.M.1979); *Panushka v. Panushka,* 221 Or. 145, 349 P.2d 450 (Or.1960); and *Sheehan v. McKinstry,* 105 Or. 473, 210 P. 167 (Or. 1922). Therefore, under an installment land sale contract a vendee as between the parties is treated as the equitable owner of the land, and ordinarily possesses all of the rights of ownership, providing that nothing in the contract states otherwise. Here, there is the further question of whether a vendee may encumber his vendee's interest in the contract.

■ One of the rights attaching to ownership of land is the power to mortgage the land. I.C. § 45–1001 provides that: "Any interest in real property which is capable of being transferred may be mortgaged." Over fifty years ago this Court held that "[t]he interest of a vendee under a contract to purchase real estate, is an interest in real property that may be transferred, and hence may be mortgaged." *Perkins v. Bundy,* 42 Idaho 560, 566, 247 P. 751,

752 (1926). For similar holdings *see Graves v. Arizona Cent. Bank,* 205 Cal. 715, 272 P. 1063 (Cal.1928); *State Highway Commission v. Demarest,* 263 Or. 590, 503 P.2d 682 (Or.1972); *Sanders v. Ulrich,* 250 Or. 414, 443 P.2d 231 (Or.1968); *Kendrick v. Davis,* 75 Wash.2d 456, 452 P.2d 222 (Wash.1969); *Sigman v. Stevens-Norton, Inc.,* 70 Wash.2d 915, 425 P.2d 891 (Wash.1967). Therefore, the vendees buying from Trayis possessed a mortgagable interest in the property in question.

■ I.C. § 45–901 defines a mortgage as a "contract excepting a trust deed or transfer in trust by which specific property is hypothecated for the performance of an act without the necessity of a change of possession." *See Eastern Idaho Loan & Trust Co. v. Blomberg,* 62 Idaho 497, 113 P.2d 406 (1941). I.C. § 45–904 provides that "[e]very transfer of an interest in property other than in trust to secure the performance of any obligation of the trustor or other person named in the trust instrument, made only as a security for the performance of another act, is to be deemed a mortgage." A security instrument, however it is called, is a mortgage whenever real property is encumbered as security for a debt or liability. *Kendrick v. Davis,* 75 Wash.2d 456, 452 P.2d 222 (Wash.1969).[2]

■ The instrument here in question encumbered all of the vendee's "right, title and interest" in the real estate contract dated August 1, 1973, and the real property subject thereto in consideration of a loan of $15,000, evidenced by a promissory note in the sum of $15,000.

In *Kendrick,* the Washington Supreme Court in a similar situation held:

"It is unnecessary to labor the proposition that these instruments were mortgages and not quitclaim deeds and assignments as they purport to be, since on their face they carry the label of security transactions. *An instrument may in form be a deed or an assignment, but, if the intent is to use the property as securi-*

**2.** *See* note 1, *supra,* where it will be noted that the assignment is couched in terms appropriate to mortgages.

*ty, it will be a mortgage."* (Citation omitted.) 452 P.2d at 225–26 (emphasis added).

See *State Highway Commission v. Demarest,* 263 Or. 590, 503 P.2d 682 (Or.1972) (assignment of purchaser's interest under a land sale contract held a mortgage); *Sanders v. Ulrich,* 250 P.2d 414, 443 P.2d 231 (Or.1968) (assignment of purchaser's interest under a land sale contract held a mortgage); *Nagle v. Club Fontainbleu,* 17 Utah 2d 125, 405 P.2d 346 (Utah 1965) (assignment of owner's interest in real property held a mortgage). Therefore, we deem it of no consequence that the form of encumbrance was an assignment of the vendees' interest in the contract, describing the property which was the subject of the contract—rather than a mortgage.

## II.

 The underlying question, however, is the nature of the rights possessed by a mortgagee of a vendee under a land sale contract as against purchasers from the vendee. At oral argument we understood counsel for appellants Rush and Clark to concede that the equitable mortgage was good as against the vendees (Anestos) and any third party purchasing from those vendees. This is correct, but it is also well-established that the continuing existence of the mortgage is hinged on the continuing existence of the vendees' interest in the contract. The mortgagee of a vendee under a land sale contract does not obtain an interest in the land per se. *Sigman v. Stevens-Norton, Inc.,* 70 Wash.2d 915, 425 P.2d 891 (Wash.1967). The vendee under a land sale contract has no power to create a mortgage valid as against the vendor of the land. *Cheff v. Haan,* 269 Mich. 593, 257 N.W. 894 (Mich.1934); *Sigman, supra.* His rights are dependent on those of his mortgagor. *Kendrick v. Davis,* 75 Wash.2d 456, 452 P.2d 222 (Wash.1969). If the mortgagor's rights in the property continue, so do the rights of the mortgagee. *Id.* If the mortgagor's rights in the land terminate, so do the mortgagee's. *Id.* In *Sheehan v. McKinstry,* 105 Or. 473, 210 P. 167 (Or. 1922), it was stated that:

"By [vendee's] partial compliance with and performance of the terms of the contract an equitable interest or estate in the land had become vested in the [vendee], and this equitable interest or estate was subject to mortgage by him, *but the enforceability of such mortgage, as a lien against the land, depended upon the condition that the contract be kept in force by the subsequent performance of its terms.*" 210 P. at 171 (emphasis added).

See *Sigman v. Stevens-Norton, Inc.,* 70 Wash.2d 915, 425 P.2d 891 (Wash.1967).

 Anestos had been in arrears in his payments on the land sale contract for over two years when Rush and Clark purchased the Anestos vendee's interest at the bankruptcy sale. This, standing alone, was insufficient to terminate either his vendee's interest in the contract or the assignment to Lockhart. *Williamson v. Smith,* 74 Idaho 79, 256 P.2d 784 (1953); *Stockmen's Supply Co. v. Jenne,* 72 Idaho 57, 237 P.2d 613 (1951). The vendor under a land sale contract ordinarily has the contractual right to declare a default for material breach or nonperformance of that contract, and thereby begin the process of closing out the purchaser's interest in the contract. It is upon a notice or declaration of default *which goes uncured* that the vendees' interest may be terminated. Ordinarily the contract sets the time for curing the default. If no time is specified in the contract, a reasonable time should be allowed. *Williamson v. Smith, supra.* The holder of an encumbrance against a defaulting vendee's interest (here the mortgagee, Lockhart) must take appropriate action to protect its rights, or otherwise the security for his loan, in this case an assignment of the contract, is subject to extinguishment if there is forfeiture or termination of the contract. Lockhart was not required to take any action so long as the original contract remained in effect. Although the underlying Anestos-Trayis contract contained no provision for giving notice of claimed default, such provision was embodied in the escrow instructions signed by both Anestos and Trayis:

"If, however, at any time prior to full payment of all principal and interest above specified, Grantor delivers to you at the office above specified, written demand for the delivery of such documents and property to him, specifying in detail as grounds therefor, either:

"(a) *That all or any part of any payment of principal or interest above specified remains unpaid and that the due date therefor has passed;* or

"(b) *That Grantee has failed to perform any specified term or condition,* other than payment of principal and interest, encumbent on him to be performed, under that certain contract dated August 1, 1973 made by and between Grantor herein as one party and Grantee herein as the other party, copy of which is deposited with you herewith for purposes of identification, *then in such event or events, hereinafter called defaults, you shall* promptly *deliver to Grantee personally, or at your option deposit in the United States mail,* postage prepaid, addressed to Grantee at 360 Hyde Ave., Pocatello, Idaho 83201 or at such other address as he may have directed by writing previously delivered to you at the branch above designated, *copy of such demand.* If it appears by your records that all payments of principal or interest designated in said demand and for which the due date has actually arrived are fully paid, or if not, *then if the same be paid before the expiration of 30 days* after said copy of demand is so delivered or mailed to Grantee, and within the same time *Grantee also proves to your satisfaction that none of the other defaults, if any, specified in said demand existed* at the time said demand was made, *or if they did that they do so no longer, Grantor's said demand shall be disregarded* and you shall continue to hold said documents and property under the terms hereof and to receive the payments as above specified at the times and on the same conditions and to the same effect as if no such demand had been made; otherwise all

said documents and property then held by you shall be delivered to Grantor; provided, however, that you may at your option at any time without liability to anyone, withhold delivery of all said documents and property and decline to receive further payments hereunder until your rights, powers, and duties hereunder in any respect requested by you have been settled acceptably to yourselves by further written instructions of the undersigned or finally determined by judicial action." (Emphasis added.)

Therefore, it was of no legal consequence that Lockhart did nothing while Trayis indulged in the delinquencies, or, as was the case here, was prevented from so doing by the bankruptcy proceeding. Lockhart was under no obligation to bid at the bankruptcy sale or tender whatever payments were required to bring the Trayis contract current. Had Trayis initiated foreclosure proceedings to terminate the contract, Lockhart could have chosen to do nothing, but it would have stood to lose the security for its loan if such proceeding terminated the contract. A party lending money on the strength of an assignment of a vendee's interest is in much the same position as a party lending money on a second mortgage. In either event the lender necessarily has to expect that in order to protect himself he may be called upon to pay the encumbrance which is prior to his. Lockhart recognized this and sought to protect itself by making repeated written requests first to Trayis, and then to Rush and Clark after they purchased the vendee's interest at the bankruptcy sale, to be notified should a formal default be declared.[3] Trayis, however, did not at any time declare a default. The vendee's equity in the contract and vendee's interest in the land which was the subject of the contract, was still extant when the bankruptcy court assumed jurisdiction thereof. The encumbrance of the assignment was still good against that equity.

### III.

Rush and Clark argue that the bankruptcy sale of the Anestos' equity

---

**3.** *See* Appendix.

somehow destroyed the Lockhart encumbrance. We fail to see such a result ensuing from the circumstances of this particular bankruptcy proceeding.

Rush and Clark made their purchases with full knowledge of Lockhart's encumbrance against the Anestos vendee's interest. Together with all other potential purchasers they were given written notice that:

> "[t]here is an encumbrance on this land to Mr. Trayis and to Financial Credit. There are numerous ramifications and complications concerning these mortgages and it would be wise for a prospective bidder to check with your Petitioner concerning these matters before entering a bid."

They were further notified that "[t]he aforementioned land is to be sold subject to all existing debts, mortgages, liens, and encumbrances of each and every kind." Evelee Rush testified at trial that, at the bankruptcy sale when she initially bid $5,000 for the 10-acre section of the Anestos' property, she was informed "I don't believe, ma'am, that you understand just exactly what you're doing. You better get some advice." Thereafter the Rushes bought that interest on a bid of $750. The bankruptcy trustee conveyed to Rush and Clark by instruments which specifically provided that "[t]he aforementioned land is sold subject to all existing debts, mortgages, liens, and encumbrances of each and every kind, and the trustee makes no warranties or representations concerning title to the land . . . ."

In sum, we agree with the trial court's conclusion that the vendee's interest in the land being purchased from Trayis was lawfully encumbered to Lockhart. The bankruptcy sale merely transferred that interest or equity from Anestos to Rush and Clark, subject, however, to both the obligation of the Trayis contract and the equitable mortgage in favor of Lockhart.

## IV.

Rush and Clark argue that the trial court in upholding the equitable mortgage on the vendee's interest which they purchased at the bankruptcy sale could not declare it to be an equitable mortgage on the seller's interest in the real property itself. Ordinarily this would be so as to the vendor's title. A vendee has no power to create a mortgage valid against the vendor of the land or his assigns. *Cheff v. Haan,* 269 Mich. 593, 257 N.W. 894 (Mich.1934); *Kendrick v. Davis,* 75 Wash.2d 456, 452 P.2d 222 (Wash.1969). However, the *Sheehan* case, *supra,* 210 P. 167, is good authority for the proposition that the mortgage of a vendee's interest under a land sale contract is effective as a lien against the land—so long as the contract survives between vendor and vendee. On the above stated premise the district court properly might have declared the lien created by the assignment (equitable mortgage) of the vendee's interest effective only against the land as in the hands of the takers of the vendee's interest—which vendee's interest passed to the plaintiffs through the bankruptcy sale. And it would seem that plaintiffs may be technically correct, or at least might be so in the ordinary case, in their assertion that the lien created by that encumbrance did not attach to the real property as in the hands of the seller. In the ordinary case, however, the court would properly refuse to quiet title in the vendors as against an outstanding interest, and here for certain there was such an outstanding interest, where the vendors (Trayis) had entered into an executory contract which had not been terminated and Lockhart had an interest—acquired from Anestos—to which the interest acquired by plaintiffs through the bankruptcy sale was subject.

Whatever interest Anestos had in the real property which he was purchasing from Trayis would have passed completely to Lockhart upon Lockhart's foreclosure of its equitable lien, to which lien and the resultant foreclosure the subsequent interests acquired by the plaintiffs at the bankruptcy proceeding would be subject. So viewed, while the court might be said to have technically gone slightly awry in declaring that the assignment created a lien on the real property itself, nonetheless, the outstanding

Trayis-Anestos contract was an encumbrance against the vendor's title. It was also a potential vendee's lien against the real property, and Lockhart had a viable interest which would on foreclosure of its assignment allow it to succeed to that same interest of the vendees.

If there was any error on the part of the district court, such was harmless. The thrust of that court's decision was the existence of the Lockhart interest and its priority over the vendee's (Anestos) interest which plaintiffs acquired through the bankruptcy sale. The court properly concluded that it would quiet title in the plaintiffs upon their extinguishing the Lockhart interest by paying the indebtedness secured by the assignment. In this case of all cases it matters little that the court declared the equitable mortgage good as against the real property. In one way it was, and in one way it was not. It has to be kept in mind that the plaintiffs acquired title to the real property in question by purchasing *both* ends of the title which was split by the Trayis-Anestos executory contract. The Trayis vendor's title was not directly affected by the mortgage placed upon it by Anestos. But the vendee's title was. The plaintiffs purchased both titles and in bringing their quiet title action based their total claim of ownership on both lines of title. As mentioned earlier, this is not the ordinary case.

■ In passing upon the plaintiffs' highly technical objection to the conclusion that the mortgage is against the real property itself, we note that the plaintiffs did not request the district court to make any conclusion based upon their acquisition of bare legal title and the vendor's contract, and it is not addressed in the brief. Accordingly we do not address it,[4] and simply agree with the district court that plaintiffs should be awarded a quiet title decree after they satisfy the Lockhart claim, and that if they do not, Lockhart can then foreclose— by which foreclosure it stands to acquire outright the vendee's interest in the Trayis-Anestos contract subject, of course, to the obligation to perform that contract.

Decree *affirmed.* Costs to respondent.

DONALDSON, C.J., BAKES, J., and WALTERS, J. Pro Tem., concur.

SHEPARD, J., concurs in the result.

BAKES, Justice, concurring specially:

I concur with the Court's opinion; however, it has modified the trial court's order of foreclosure which was entered November 3, 1980. In that order, the trial court held that if the plaintiffs did not pay the balance of $12,125.62 the defendant Lockhart may thereafter proceed in an action to foreclose its equitable lien. However, as our opinion points out, Lockhart's equitable lien is only good as against the vendee's interest. If the vendee's interest is acquired by Lockhart on foreclosure, it still must perform the Trayis-Anestos contract and pay off the vendor's interest. Furthermore if the vendee's interest is in default, then the plaintiffs would be entitled to foreclose or

---

4. The plaintiffs do not contend that their purchase of the Trayis title and the vendor's contract eliminates the Lockhart claim against the vendee's interest; nor should they.

"On an assignment by the vendor of a contract for the sale of land the assignee succeeds to all the rights of the vendor. The assignee acquires only the rights of the vendor and is subject to the defenses and equities existing between the assignor and purchaser at the time of the assignment." 92 C.J.S. *Vendor & Purchaser* § 310 (1955) (footnotes omitted).

"The general rule is that a purchaser of real estate takes subject to outstanding equitable interests in the property which are enforceable against him to the same extent they are enforceable against the vendor, where the purchaser is not entitled to protection as a bona fide purchaser. This rule prevails a fortiori where the grantee expressly takes subject to the earlier equity." 77 Am.Jur.2d *Vendor & Purchaser* § 612 (1975).

Only where the vendee's interest has theretofore been terminated, or is properly terminated after buying the vendor's interest, is the interest of the vendee and his assignees extinguished and thereby also the rights of the vendee's mortgagee. *See Anderton v. Waddell,* 86 Idaho 220, 384 P.2d 675 (1963) (assignees of vendee had no further rights in contract when vendee's rights were terminated upon his default).

terminate the vendee's interest according to the default provisions of the contract. But as this Court's opinion points out, the defendant Lockhart cannot foreclose its equitable mortgage against the vendee's interest and thereby deprive the plaintiffs of their title to the property. Only by performing the contract and paying off the vendor's interest can that be accomplished. And, if at this juncture the vendee's interest has already been terminated because of default, then the Lockhart equitable mortgage would have been extinguished.

### APPENDIX

On May 17, 1976, Financial Credit Corporation sent the following written request to Angelo and Katherine Trayis and to First Security Bank as escrow holder of the land sale contract.

"On July 26, 1974, Peter T. Anestos and Ardath I. Anestos of Pocatello, assigned to Financial Credit Corp. of 117 So. 6th, Pocatello, Idaho, all of their interests in a certain real estate contract dated August 1, 1973, wherein Angelo Trayis and Katherine Trayis, husband and wife, appear as sellers, and Peter T. Anestos and Ardath I. Anestos, husband and wife, appear as buyers. This contract covers a parcel of land located up Pocatello Creek Road, Pocatello, Idaho.

"The assignment was made to Financial Credit Corp. to cover a loan which was granted to Mr. and Mrs. Anestos on July 26, 1974. It is our understanding that First Security Bank, Pocatello, Idaho, is the escrow holder on this contract.

"The purpose of this letter then shall be to serve as notice to you of the interest of Financial Credit Corp. in the above mentioned contract.

"I would greatly appreciate it if Financial Credit Corp. would be notified should Mr. and Mrs. Anestos default in their contract with you.

"If you should have any questions concerning this matter, please do not hesitate to contact me."

On July 20, 1976, Financial Credit Corporation sent by certified mail identical requests to Edward Berrett, attorney for the Trayises, to the Trayises themselves, and to First Security Bank. On May 12, 1978, the day after the bankruptcy proceedings, Lockhart (successor to Financial Credit Corp.) sent the following request to Edward Berrett, attorney for the Trayises:

"I assume you are aware that our office represents The Lockhart Company in this matter. We attended the hearing in Blackfoot yesterday in which Mr. Clark purchased the interest of Anestos in approximately ten acres for $500.00 and a Mrs. Evelyn Hill purchased the Anestos interest in another tract of approximately ten acres for some $700.00. It thus appears that we now are in a position where the Court has, in effect, abandoned this property from the estate. One might naturally assume that Mr. Clark and Mrs. Hill will be in contact with Mr. Trayis concerning the possibility of bringing the contracts to a current status.

"Our concern for The Lockhart Company, quite naturally, is that the contracts be placed in a current status so that no default would be declared. We would hope that no Notice of Default will be submitted in the near future, allowing these people the opportunity to negotiate with your client. However, should you and he determine that a Notice of Default is appropriate, we would be grateful if you would be kind enough to provide a copy of that default notice to us so that we would be aware of the status and take whatever action might become necessary to protect the interest of our client."

Rush and Clark instituted this lawsuit approximately eight months thereafter.